UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:01CV-6-M

UNITED STATES OF AMERICA                                                                           PLAINTIFF

vs.

GEORGE RUDY CUNDIFF and
CHRISTOPHER SETH CUNDIFF                                                                      DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court for a determination of whether the wetlands at issue in this litigation constitute "waters of the United States" under the Clean Water Act. On January 25, 2007, the Court conducted an evidentiary hearing on this issue. The parties have filed post-hearing briefs [DN 170, DN 171]. Fully briefed and argued, this matter is ripe for decision.

## I. BACKGROUND

This civil enforcement action arises out of violations of Section 301(a) of the Clean Water Act (CWA), 33 U.S.C. § 1311(a), by Defendants George Rudy Cundiff and his son, Christopher Seth Cundiff. Defendants own two adjacent tracts of land in Muhlenberg County, Kentucky. Defendants' properties are situated adjacent to Pond and Caney Creeks, tributaries of the Ohio River via the Green River. By Memorandum Opinion and Order entered on April 28, 2003, the Court granted the United States' Motion for Summary Judgment, holding that Defendants violated Section 301(a) of the Clean Water Act ("CWA").

In January of 2005, after a three-day remedy bench trial, the Court permanently enjoined Defendants from discharging dredged or fill material or any other pollutants into waters of the United States, except in compliance with the CWA.  The Court imposed a civil penalty of $225,000 but suspended $200,000 pending Defendants' adequate implementation of the United States' restoration plan.  The $25,000 was ordered to be paid in equal installments over five years.[1]  Defendants appealed the judgment to the United States Court of Appeals for the Sixth Circuit.

On June 19, 2006, the United States Supreme Court issued a decision in Rapanos v. United States, 547 U.S. ___, 126 S.Ct. 2208 (2006).  The opinion addressed the meaning of the phrase "waters of the United States" in the CWA and accompanying regulations.  The parties jointly moved for a limited remand from the Sixth Circuit Court of Appeals so that this Court could address whether the wetlands at issue in the present case are "waters of the United States" in light of Rapanos.  On September 29, 2006, the Sixth Circuit remanded the case for consideration of that question.

Defendants contend that under the new standard articulated in Rapanos the wetlands at issue do not qualify as "waters of the United States" and, therefore, the United States lacks jurisdiction over the site.  The United States disagrees arguing that its exercise of jurisdiction over the wetlands at the site is proper because the wetlands constitute "waters of the United States" under the meaning of the Clean Water Act, the applicable regulations, and the

---

[1] Additional information regarding the factual and procedural history of this case is set forth in the Findings of Fact and Conclusions of Law issued on January 10, 2005 [DN 111].

Rapanos decision.

## II. LAW

### A. Overview of Rapanos v. United States

The Clean Water Act prohibits "the discharge of any pollutant by any person" except provided in the Act. 33 U.S.C. § 1311(a). "Discharge of pollutants" encompasses "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Navigable waters," in turn, is defined as "waters of the United States . . . ." 33 U.S.C. § 1362(7). In interpreting the CWA, the Environmental Protection Agency and the Army Corps of Engineers "have issued regulations extending CWA jurisdiction to waters used in interstate commerce, tributaries of waters used in interstate commerce, and wetlands adjacent to either waters used in interstate commerce or to the tributaries of such waters." United States v. Evans, 2006 WL 2221629, *16 (M.D. Fla. Aug. 2, 2006); 33 C.F.R. § 328.3; 40 C.F.R. § 122.2. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985); Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159 (2001).

In light of the EPA and the Corps interpretation of CWA jurisdiction, the Supreme Court in Rapanos v. United States, 126 S.Ct. 2208 (2006), addressed the proper interpretation of the phrase "waters of the United States" and the corresponding scope of the Corps jurisdiction under the Clean Water Act. Rapanos involved two consolidated cases from the Sixth Circuit. In one case, the United States brought an enforcement action alleging that property owners and their affiliated businesses deposited fill materials into wetlands without

3

a permit in violation of the CWA. See United States v. Johnson, 467 F.3d 56, 59 (1st Cir. 2006)(citing Rapanos, 126 S.Ct. at 2219). In the other, property owners "were denied a permit to deposit fill material in a wetland located on a . . . parcel of land about one mile from [a lake]" and, after exhausting their administrative appeals, they filed suit. Rapanos, 126 S.Ct. at 2219; Johnson, 467 F.3d at 59.

The district court found that there was federal regulatory jurisdiction over the sites in question. The Sixth Circuit affirmed, holding that there was federal jurisdiction over the wetlands at the sites because "'there were hydrological connections between [the] sites and corresponding adjacent tributaries of navigable waters.'" Rapanos, 126 S.Ct. at 2219 (citing Rapanos, 376 F.3d 629, 643 (2004)). The Supreme Court then consolidated the cases and granted certiorari to decide whether these wetlands constitute "waters of the United States" under the Clean Water Act. Id. at 2220.

The Court issued a split decision, 4-4-1, construing the phrase "waters of the United States" as used in the Clean Water Act. Justice Scalia writing for the plurality concluded that the phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" Id. at 2225. "The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." Id. For purposes of determining federal regulatory jurisdiction over wetlands, the plurality held that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own

right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." Id. at 2226 (emphasis in original). See also Johnson, 467 F.3d at 59. Thus, under the plurality's standard, establishing that wetlands are covered by the Clean Water Act requires two findings: "First, that the adjacent channel contains a 'wate[r] of the United States,' ( i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." Rapanos, 126 S.Ct. at 2226-27 (citations omitted)). The plurality vacated the decision of the Sixth Circuit and, noting "the paucity of the record," remanded for further proceedings. Id. at 2235; Johnson, 467 F.3d at 59.

Justice Kennedy concurred in the judgment, but rejected the plurality's rationale. Id. Instead, he concluded that the government's jurisdiction under the Clean Water Act extends to wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id. at 2236. Specifically, Justice Kennedy held that "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 2248. Under this standard, "[w]here the wetlands in question are 'adjacent to navigable-in-fact waters, [the government] may rely on adjacency to establish its jurisdiction.' . . . Where the wetlands are adjacent to nonnavigable tributaries, '[a]bsent more specific regulations . . . [the government] must

5

establish a significant nexus on a case-by-case basis.'" Johnson, 467 F.3d at 59 (quoting Rapanos, 126 S.Ct. at 2249)).

Writing for the four dissenting justices, Justice Stevens would have upheld the EPA's and the Corps' interpretation of "waters of the United States" in its entirety. Justice Stevens held that any "significant nexus" requirement of the Clean Water Act "is categorically satisfied as to wetlands adjacent to navigable waters or their tributaries.'" Rapanos, 126 S.Ct. at 2264 (citing Riverside Bayview, 474 U.S. at 123). In light of the plurality and concurring decisions, Justice Stevens suggested that the Corps' jurisdiction would extend to cases "in which either the plurality's or Justice Kennedy's test is satisfied . . . ." Id. at 2265. See also Johnson, 467 F.3d at 60; Evans, 2006 WL 2221629,*19.

### B. The Controlling Standard

The United States argues that the Corps may continue to exercise regulatory jurisdiction over any wetland that satisfies either the plurality's standard or Justice Kennedy's standard in Rapanos. Relying on Marks v. United States, 430 U.S. 180 (1977), the Defendants disagree arguing that the plurality decision controls. Under the holding in Marks, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks, 430 U.S. at 193.

While the Sixth Circuit has not yet addressed which standard governs, other Court of Appeals have addressed this issue. Relying on Marks, both the Ninth Circuit and the Seventh

Circuit concluded that Justice Kennedy's concurrence actually provides the controlling test. Northern California River Watch v. City of Healdsburg, 457 F.3d 1023 (9th Cir. 2006)(significant nexus test set forth in Justice Kennedy's concurrence is controlling); United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006)(noting that the narrowest opinion is Justice Kennedy's concurrence which is the least restrictive of federal authority to regulate). By contrast, the First Circuit concluded that the United States could assert jurisdiction over the sites in question if the Government meets either Justice Kennedy's standard or that of the plurality. Johnson, 467 F.3d at 60. The First Circuit noted that the Supreme Court has moved away from the Marks formula and has indicated "that whenever a decision is fragmented such that no single opinion has the support of five Justices, lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced." Id. at 65 (citing Waters v. Churchill, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the test that lower courts should apply); League of United Latin Am. Citizens v. Perry, 126 S.Ct. 2594, 2607 (2006) (Kennedy, J.) (analyzing Vieth v. Jubelirer, 541 U.S. 267 (2004) to find that agreement among one concurring and four dissenting Justices establishes majority support for a legal proposition); Alexander v. Sandoval, 532 U.S. 275, 281-82 (2001) (Scalia, J.) (noting the agreement of five Justices who joined plurality and various dissenting opinions)). See also United States v. Evans, 2006 WL 2221629 (M.D. Fla. August 2, 2006). Significantly, in accordance with this case law, the four dissenting Justices in Rapanos stated explicitly that they would sustain

the exercise of federal regulatory jurisdiction under the CWA whenever either the plurality's standard or Justice Kennedy's standard is satisfied. Rapanos, 126 S.Ct. at 2265 and n.14.

After a review of the case law, the Court adopts the First Circuit's approach and concludes that the United States may establish jurisdiction over the Cundiff site if it can meet either Justice Kennedy's or the plurality's standard as set forth in Rapanos.

### III.  DISCUSSION

**A.  Justice Kennedy's Standard – The Significant Nexus Test**

Under the significant nexus test as defined by Justice Kennedy in his concurrence, the party seeking to invoke jurisdiction under the Clean Water Act must present evidence that the wetlands in question "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Rapanos, 126 S.Ct. at 2236. According to Justice Kennedy, "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 2248. In contrast, "[w]hen . . . wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id. The United States must establish a significant nexus on a case-by-case basis. See Johnson, 467 F.3d at 59 (quoting Rapanos, 126 S.Ct. at 2249)).

After a review of the testimony and the expert reports, the Court finds that a significant nexus exists between the wetlands in question and the traditional navigable-in-fact

water – the Green River.   Dr. Lyndon C. Lee, a professional wetland scientist, testified that the wetlands on the Cundiff site perform significant functions that directly, indirectly, and cumulatively contribute to, enhance, and affect the physical, chemical, and biological integrity of Pond Creek, Caney Creek, and the Green River.  Dr. Lee opined that the wetlands on the Cundiff site serve several important ecological functions including both temporary and long term water storage, the filtering of acid mine drainage and sediment, and habitat support for plant and wildlife species that are endemic to wetland ecosystems. (Lee Report at i, 7-8.)

Specifically, Dr. Lee testified that Rudy Cundiff's unauthorized ditch construction, mechanical land clearing and filling of the wetlands at the site have diminished the capacity of the wetlands in question to store water.  According to Dr. Lee, this reduction affects the frequency and extent of downstream flooding, increases the flood peaks in the Green River, and, in turn, "impact[s] navigation, crop production in bottomlands, downstream bank erosion and sedimentation." (Lee Report at 7.)

Additionally, Dr. Lee and Ed Carroll, Environmental Control Supervisor with the Kentucky Division of Water, testified that they observed acid mine drainage and sediment flow onto the Cundiff property from upstream sites.  Mr. Carroll testified that the wetlands in question, along with other surrounding wetlands, perform vital filtering and sediment trapping functions which treats pollutants, contaminants, and toxins and affect the overall water quality of the Green River.  According to Mr. Carroll, Pond Creek has been channelized by the unauthorized activities of the Cundiffs thereby causing the acid mine drainage to bypass the wetlands in question and move quickly into Pond and Caney Creek

and the Green River. (See Aeriel Video Tape, Carroll Dep. Exhibit A.) When the acid mine drainage and associated sediments move too quickly downstream in the Pond/Caney Creek system to the Green River, "there are direct and significant impacts to navigation (via sediment accumulation in the Green River) and to aquatic food webs . . . that are not adapted to thrive in acid waters and/or sediment-choked environments in the Green River." (Lee Report at 8.)

The Court credits the testimony of Plaintiff's experts and finds that the Cundiff wetlands, alone and in combination with other area wetlands, "significantly affect the chemical, physical, and biological integrity" of the Green River. Rapanos, 126 S.Ct. at 2248. For these reasons, the Court concludes that the wetlands at the Cundiff site are "waters of the United States" under the standard articulated by Justice Kennedy in Rapanos.

### B. Plurality's Standard

Although the United States has satisfied Justice Kennedy's significant nexus standard, the Court will address the facts in light of the plurality's standard as well. Under the plurality's standard, establishing that wetlands are covered by the Clean Water Act requires two findings: "First, that the adjacent channel contains a 'wate[r] of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." Rapanos, 126 S.Ct. at 2227. After an examination of the expert testimony and reports, the Court concludes that the wetlands at the site are "waters of the United States" as defined by the standard

articulated by the plurality in Rapanos.

First, Dr. Lee and Mr. Carroll presented undisputed testimony that the South Channel located on the northern tract, Pond Creek, and Caney Creek are relatively permanent bodies of water connected to a traditional interstate navigable water, the Green River. Dr. Lee presented an aerial photograph of the site depicting the water flow. With respect to the South Channel, Dr. Lee testified that water flows eastward through the South Channel into Pond Creek for all but a few weeks in a year of average rainfall. (Lee Hearing Testimony.) With respect to Pond Creek and Caney Creek, Dr. Lee and Mr. Carroll introduced maps, historical aerial photographs, and an aerial videotape reflecting that Pond Creek and Caney Creek are open waterbodies with significant quantities of flowing water. Additionally, Dr. Lee testified that on October 25, 2006, he along with two other persons navigated Pond Creek from one mile upstream of the site, past the eastern boundary of the site, and then to the Green River. The approximately 11-mile trip took place "at a time when discharge volumes in the Pond Creek system and its tributaries were at near seasonal low discharge." (Lee Report at 6.) Given this evidence, clearly the portions of Pond Creek and Caney Creek that connect the Cundiff wetlands to the Green River, as well as the South Channel, are "relatively permanent, standing or continuously flowing bodies of water," and therefore satisfy the first element of the plurality's standard. Rapanos, 126 S.Ct. at 2225.

Second, since the Court determined that Pond Creek, Caney Creek, and the South Channel are "waters" as defined above, the Court must next determine "whether the wetlands in question are 'adjacent' to these 'waters' in the sense of possessing a continuous surface

11

connection that creates the boundary-drawing problem [the Supreme Court] addressed in *Riverside Bayview*." Rapanos, 126 S.Ct. at 2235.

Defendants maintain that the continuous surface connection requirement is not satisfied where the water level of the alleged wetland is at a different level than that of the creeks. The Court finds Defendants' interpretation of the continuous surface connection element to be incorrect. In discussing the boundary drawing problem, the Rapanos plurality noted that in Riverside Bayview the Supreme Court had acknowledged that there was an inherent ambiguity in drawing the boundaries of any "waters":

> [T]he Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs-in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of 'waters' is far from obvious.

Rapanos, 126 S.Ct. at 2225 (quoting Riverside Bayview, 474 U.S. at 132.) According to the Rapanos plurality, because of this inherent ambiguity, the Supreme Court in Riverside Bayview "held, the agency could reasonably conclude that a wetland that 'adjoin[ed]' waters of the United States is itself a part of those waters." Id. (citing Riverside Bayview, 474 U.S. at 132, 135, & n. 9). Given this discussion of Riverside Bayview, Justice Scalia clearly did not intend that the water level of the wetland and the covered "waters" must be completely level. Such a conclusion would completely eviserate the plurality's recognition that a gradual transition can exist from water to land, *e.g.*, shallows, marshes, mudflats, swamps, bogs-in short. Id. at 2225 (Riverside Bayview, 474 U.S. at 132).

After a review of the record, the Court concludes that the wetlands at the Cundiff site have a continuous surface connection with Pond Creek, Caney Creek and the South Channel making it difficult to determine where the water ends and the wetland begins. The Plaintiff's experts testified that there are no clear demarcation between waters and wetlands at the Cundiff site. In fact, a review of the expert testimony, aerial maps, aerial video, along with photographs introduced at the hearing, confirm that the wetlands at the site physically abut the South Channel, Pond Creek, and Caney Creek.

Additionally, there are several locations in the northern and southern tracts where Pond and Caney Creek and the Cundiff wetlands have a continuous surface connection during significant storm events, bank full periods, and/or at ordinary high flows. The record reflects that water flows between the wetlands and Pond and Caney Creek through such conduits as an inadequately armored bank of Caney Creek at the location of the former western ditch, a rock-stabilized cut and swale at Caney Creek near the center of the northern tract, excavated swales along the eastern bank of the northern tract at Pond Creek, and a rock ramp/swale system in the northeastern corner of the southern tract at Pond Creek. Furthermore, during flood stage, over bank flooding creates numerous surface water connections between Pond Creek and Caney Creek and the wetlands. Dr. Lee also testified that the Cundiff wetlands are connected by a permanent surface water flow to Pond Creek via a deep ditch [Southern Channel (the North Tract-South Ditch in Figure 10)] that passes through the wetlands on the south side of the northern tract. According to Dr. Lee, the surface water continuously flows from the wetlands into Pond Creek from a discharge point

in this ditch located at the southeast corner of the northern tract. Further, Dr. Lee stated that because the site is nearly level, flood waters from the northern tract also back flow south through a 36-inch iron culvert cut between the north and south tracts.

For these reasons, the Court finds that the Cundiff wetlands are covered "waters of the United States" as defined by the plurality standard in Rapanos.

## IV.  CONCLUSION

For the reasons set forth above, the Court concludes that the wetlands at issue in this litigation constitute "waters of the United States" under the Clean Water Act as defined by both Justice Kennedy's test and the plurality's test; and thus, the United States properly exercised jurisdiction over the site.


cc: counsel of record